FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 06, 2023

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

ADAM M.,[1]

               Plaintiff,

      v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

            Defendant.

No.    4:22-cv-5027-EFS

**ORDER GRANTING PLAINTIFF'S SUMMARY-JUDGMENT MOTION, DENYING DEFENDANT'S SUMMARY-JUDGMENT MOTION, AND REMANDING FOR FURTHER PROCEEDINGS**

Plaintiff Adam M. appeals the denial of benefits by the Administrative Law Judge (ALJ). Because the ALJ failed to provide adequate reasons supported by substantial evidence for discounting Plaintiff's symptom reports, the Court reverses the ALJ's decision and remands this matter for further proceedings.

///

//

/

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 1

1

## I.    Five-Step Disability Determination

2        A five-step evaluation determines whether a claimant is disabled.[2]  Step one

3  assesses whether the claimant is engaged in substantial gainful activity.[3]  Step two

4  assesses whether the claimant has a medically severe impairment or combination

5  of impairments that significantly limit the claimant's physical or mental ability to

6  do basic work activities.[4]  Step three compares the claimant's impairment or

7  combination of impairments to several recognized by the Commissioner to be so

8  severe as to preclude substantial gainful activity.[5]  Step four assesses whether an

9  impairment prevents the claimant from performing work he performed in the past

10  by determining the claimant's residual functional capacity (RFC).[6]  Step five

11  assesses whether the claimant can perform other substantial gainful work—work

12  that exists in significant numbers in the national economy—considering the

13  claimant's RFC, age, education, and work experience.[7]

14

15

16  _____

17  [2] 20 C.F.R. §§ 404.1520(a), 416.920(a).

18  [3] *Id.* §§ 404.1520(a)(4)(i), (b), 416.920(a)(4)(i), (b).

19  [4] *Id.* §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c).

20  [5] *Id.* §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

21  [6] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

22  [7] *Id.* §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).

23

## II.    Background

In August 2017, Plaintiff filed an application for benefits under Title 16, claiming disability based on hearing loss in both ears, scoliosis in the mid-to-lower back, attention deficit hyperactivity disorder (ADHD), depression, and anxiety.[8] Plaintiff alleged an onset date of March 14, 2014.[9]  After the agency denied his applications initially and on reconsideration,[10] Plaintiff requested a hearing before an ALJ.

### A.    2019 Hearing & Decision

In June 2019, ALJ Mark Kim held a hearing at which Plaintiff and a vocational expert testified.[11]  In July 2019, the ALJ issued a written decision denying disability.[12]  However, after finding that the ALJ had not adequately addressed Plaintiff's mental-health treatment records, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.[13]  The Appeals Council directed the ALJ to "[g]ive further consideration to the claimant's maximum residual functional capacity during the entire period at issue and

---

[8] AR 352–61, 418.

[9] AR 18, 434.

[10] AR 168–83, 184–99.

[11] AR 85–112.

[12] AR 203–14.

[13] AR 45–48.

provide rationale with specific references to evidence of record in support of assessed limitations."[14]

## B.    2021 Hearing & Decision

In January 2021, on remand, the ALJ held another hearing at which Plaintiff and a vocational expert testified.[15]  In February 2021, the ALJ issued a written decision again denying Plaintiff's disability application.[16]  As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since August 16, 2017, the application date.

- Step two: Plaintiff had the following medically determinable severe impairments: scoliosis of the lumbar and thoracic spine, hearing loss, depressive disorder, anxiety disorder, ADHD, personality disorder, and learning disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

//

/

---

[14] AR 47–48.

[15] AR 113–39.

[16] AR 18–30.

- RFC: Plaintiff had the RFC to perform medium work, except,

    he is limited to occupations that do not require fine hearing capabilities; must avoid excessive noise in excess of regular traffic noise or moderate level; must avoid hazards such as dangerous moving machinery and unprotected heights; can perform simple, routine, unskilled tasks with a reasoning level of 3 or less; is limited to work involving only occasional and simple changes, and that do not require fast-paced type tasks; is limited to work involving no interaction with the public, including no working with crowds; and is limited to work involving only occasional superficial interaction with coworkers.[17]

- Step four: Plaintiff had no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as industrial cleaner, hospital cleaner, and hand packager.[18]

In reaching his decision, the ALJ did not consider any of the medical opinions to be particularly persuasive, finding "somewhat persuasive" only the opinion of Dan Donahue, PhD, a state-agency psychological consultant who reviewed Plaintiff's file and opined as to his mental RFC in October 2017.[19]  The

---

[17] AR 24.

[18] AR 30.

[19] AR 26–27. *See also* AR 179–81 (Dr. Donahue's opinion as to Plaintiff's mental RFC)

ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 5

ALJ found all other medical sources of record unpersuasive, including the following:

- James Irwin, MD, a state-agency medical consultant who reviewed Plaintiff's file and opined as to his physical RFC in December of 2017;[20]

- John Robinson, PhD, a state-agency medical consultant who reviewed Plaintiff's file and opined as to his mental RFC in December of 2017;[21]

- Christina Moore, ARNP, a treating provider who filled out a physical functional evaluation on behalf of Plaintiff in May 2019;[22]

- David Morgan, PhD, an examining psychologist who conducted a psychological evaluation of Plaintiff in May of 2019;[23]

- Ken Owens, Plaintiff's treating mental-health therapist, who filled out a mental-source statement on behalf of Plaintiff in May of 2019;[24] and

- N.K. Marks, PhD, an examining psychologist who performed psychological evaluations of Plaintiff in September 2014, October 2016, and June 2017.[25]

---

[20] AR 192–94.

[21] AR 192–94.

[22] AR 714–16 (duplicated at AR 740–42).

[23] AR 707–11.

[24] AR 733–36.

[25] AR 613–19, 627–34.  The ALJ did not specifically address the persuasiveness of Dr. Marks.  Instead, the ALJ erroneously implied that Dr. Marks' opinions are

The ALJ also found Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record."[26]

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[27]  Plaintiff timely appealed to the Court.[28]

### III.    Standard of Review

A district court's review of the Commissioner's final decision is limited.[29] The Commissioner's decision is set aside "only if it is not supported by substantial evidence or is based on legal error."[30]  Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable

---

"inherently neither valuable nor persuasive" under 20 C.F.R. § 416.920b(c). AR 28. *See also* 20 C.F.R. § 416.920b(c) (setting forth categories of evidence that are deemed "inherently neither valuable nor persuasive").

[26] AR 25.

[27] AR 1–6.

[28] *See* 20 C.F.R. §§ 404.981, 416.1481, 422.201.

[29] 42 U.S.C. § 405(g).

[30] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012).

1    mind might accept as adequate to support a conclusion."[31]  Because it is the role of

2    the ALJ to weight conflicting evidence, the Court upholds the ALJ's findings "if

3    they are supported by inferences reasonably drawn from the record."[32]  Further,

4    the Court may not reverse an ALJ decision due to a harmless error—one that "is

5    inconsequential to the ultimate nondisability determination."[33]

6                              IV.    Analysis

7              Plaintiff first argues that the ALJ improperly rejected Plaintiff's symptom

8    testimony.

9    A.    **Symptom Reports: Plaintiff shows consequential error.**

10             As there is no affirmative evidence of malingering, after considering the

11    relevant factors, the ALJ was required to provide specific, clear, and convincing

12

13   [31] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir.

14   1997)).

15   [32] *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). *See also Lingenfelter v.*

16   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire

17   record as a whole, weighing both the evidence that supports and the evidence that

18   detracts from the Commissioner's conclusion," not simply the evidence cited by the

19   ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)

20   ("An ALJ's failure to cite specific evidence does not indicate that such evidence was

21   not considered[.]").

22   [33] *Molina*, 674 F.3d at 1115 (cleaned up).

23

                    ORDER RULING ON CROSS SUMMARY-JUDGMENT MOTIONS - 8

reasons—supported by substantial evidence—for rejecting Plaintiff's symptom reports.[34] As explained below, the ALJ failed to meet this standard.

### 1. Hearing Loss

As a preliminary matter, Plaintiff seemingly challenges the ALJ's findings regarding hearing loss.[35] But the ALJ accurately noted in his decision that Plaintiff "reported that he uses hearing aids and has trouble hearing some conversation with background noise."[36] The ALJ's decision reflects he accepted Plaintiff's hearing-loss claims, as he crafted an RFC limited to jobs that do not require fine-hearing capabilities and which avoid excessive noise as well as hazards such as dangerous machinery.[37] Plaintiff does not articulate any additional hearing-based limitations that the ALJ should have included in the RFC. The Court therefore finds no error in this regard.

---

[34] See *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p, 2016 WL 1119029, at *7.

[35] See ECF No. 11 at 5 ("The ALJ's only reason for rejecting Moore's claim of bilateral hearing loss and scoliosis with back pain are some normal examination findings, including normal straight leg raise tests, normal ambulation, and no sensory deficits.").

[36] AR 25.

[37] AR 24.

1

2.    **Scoliosis with Back Pain**

2

Plaintiff testified that his mid-to-lower back hurts all the time ("no matter

3

what") and nothing provides relief.[38]  He said that because of his scoliosis and back

4

pain, he can sit for only about an hour and stand for only about 15 minutes at a

5

time.[39]  Plaintiff also testified that he is limited to lifting a maximum of 25

6

pounds.[40]

7

The ALJ rejected Plaintiff's scoliosis-related testimony.  The ALJ pointed to

8

benign findings upon examination, namely normal results for straight leg raises,

9

ambulation, toe and heel walking, gait and station, and range of motion of the

10

thoracic spine, as well as findings of no sensory deficits and no acute distress.[41]

11

The ALJ also highlighted that when Plaintiff received treatment for back pain, he

12

was advised to take Tylenol as needed and to perform back exercises and stretches

13

14

15

16

[38] AR 96–97, 121.

17

[39] AR 125.

18

[40] AR 126.

19

[41] AR 25. The ALJ also cited to a May 2019 examination that "revealed no

20

abnormalities." *Id.*  But that treatment note is of little support to the ALJ, as the

21

musculoskeletal portion of the examination merely states, "*Visual* overview of all

22

four *extremities* is normal." AR 723 (emphasis added).

23

at home.[42]  The ALJ's proffered reasons are valid in theory but lack sufficient support and explanation.

### a.    *Benign Medical Findings*

Medical findings may serve as a clear and convincing reason to discount a claimant's testimony, but only if such medical findings are truly inconsistent with specifically identified testimony.[43]  The ALJ did not explain why the identified findings are inconsistent with Plaintiff's testimony that his back pain causes limitations in sitting, standing, and lifting.[44]  After all, it is undisputed that Plaintiff has scoliosis; the ALJ found it to be a medically determinable severe impairment, and the diagnosis has been confirmed by medical imaging.[45]  But

---

[42] AR 25.

[43] *See* 20 C.F.R. §§ 404.1529(c)(3)–(4) 416.929(c)(3)–(4).

[44] In assessing Plaintiff's physical impairments, ALJ also repeatedly cited a finding of "mild dysarthria," and it is unclear whether the ALJ considered this to undermine Plaintiff's testimony and/or any of the medical opinions. *See* AR 25, 26. Dysarthria is described by the National Institute on Deafness and Other Communication Disorders as a "group of speech disorders caused by disturbances in the strength or coordination of the muscles of the speech mechanism as a result of damage to the brain or nerves." NIH, *Dysarthria*, https://www.nidcd.nih.gov/glossary/dysarthria (accessed Feb. 17, 2023).

[45] AR 21, 599–602.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

neither the Court nor the ALJ qualify as medical experts, and the ALJ found all the medical opinions regarding the limiting effects of Plaintiff's scoliosis to be unpersuasive.[46]  Without more, the ALJ's implied finding that the cited findings are inconsistent with Plaintiff's testimony is not supported by substantial evidence or sufficient explanation.

> b.   _Conservative Treatment of Physical Impairments_

"Evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."[47]  Substantial evidence supports the ALJ's implied finding that Plaintiff pursued and received only conservative treatment for his back pain.[48]  Yet, the ALJ did not address whether Plaintiff's

---

[46] _See Day v. Weinberger_, 522 F.2d 1154, 1156 (9th Cir. 1975).  As an example of an issue likely needing medical expertise, Plaintiff argues on appeal that a straight leg raise test "looks for lumbar nerve root irritation, not pain due to scoliosis." _See_ ECF No. 11 at 6.  But the record lacks any evidence which allows the Court to assess this assertion.

[47] _Parra v. Astrue_, 481 F.3d 742, 750–51 (9th Cir. 2007) (upholding the rejection of the claimant's pain-severity testimony where the ALJ "noted that [the claimant]'s physical ailments were treated with an over-the-counter pain medication").

[48] _See, e.g._, AR 625 (Jan. 2017: "noncompliant with referral last year to PT/ortho . . . noncompliance with recommendations supports that the patient does not feel that his pain is bad enough to get assistance"); AR 683 (April 2019: advising

conservative treatment could be explained by reasons other than his back pain being less severe than he claimed.  Notably, both medical records cited by the ALJ relate to Plaintiff establishing care with a new physician.[49]  Based on logic and common experience, one would reasonably expect a doctor who is just beginning to treat a new patient to recommend conservative care—at least to start—before progressing to more aggressive treatment options.

More importantly, Plaintiff offered potential explanations for the lack of increased treatment.  Plaintiff testified that when he got clean and sober after suffering from a drug addiction, he decided against "all kinds of medication," which presumably includes prescription-level pain killers.[50]  Plaintiff further said he is "not a big fan of doctors" and does not trust them because of bad experiences when undergoing surgery as a child.[51]  He also indicated he cannot afford "any kind of stuff medically."[52]

---

Plaintiff to take Tylenol as needed and to do home-based back stretches for back pain); AR 739 (Nov. 2020: advising Plaintiff to perform back stretches and to take Tylenol as needed, and referring Plaintiff to physical therapy).

[49] AR 25, 26 (repeatedly citing AR 679, 682–83, 738–39).

[50] *See* AR 123.

[51] AR 99.

[52] AR 99.

1
2
3
4
5

     Under these circumstances, the Court cannot dismiss as harmless the ALJ's failure to address potential alternative explanations for Plaintiff's conservative level of care.  The ALJ therefore failed to provide clear and convincing reasons supported by substantial evidence for rejecting Plaintiff's back-pain symptom testimony.

6

    **3.**   **<u>Hernia</u>**

7
8
9
10

     Plaintiff testified that he has an inguinal hernia that will "flare up" if he spends "too much time walking."[53]  Plaintiff's hernia is documented in the medical records.[54]  And the ALJ inquired about it at the January 2021 hearing.[55]  Yet, the ALJ's written decision did not address—or even mention—Plaintiff's hernia.

11
12
13

     The ALJ's oversight is consequential.  The ALJ assessed Plaintiff as capable of performing medium work without any walking-related limitations.[56]  Medium work includes jobs requiring "a good deal of walking."[57]  Each of the three

14
15

---

16
17
18
19

[53] AR 97.

[54] *See, e.g.*, AR 582 (April 2016: "large inguinal hernia needs to be repaired before it worsens and causes an emergency"); AR 594, 596 (Jan. 2015: physical exam positive for left inguinal hernia, but "pt declined general surgery referral"); AR 738 (same).

20

[55] AR 97–98.

21
22

[56] *See* AR 24. *Cf.* AR 98 ("I don't do a lot of walking, so it doesn't bother me.").

[57] *See* 20 C.F.R. §§ 404.1567(b)–(c), 416.967(b)–(c).

23

representative occupations listed by the ALJ are defined as medium work, and the
Dictionary of Occupational Titles does not indicate that any of the three
occupations inherently involve less walking.[58]

### 4.  Mental-Health Impairments

Regarding his depression, Plaintiff testified that his depression left him with
no drive or motivation. He said, "There are days where I don't take care of myself.
I don't get out of bed for hours."[59] He indicated this occurred "at least weekly" and
that, on average, he stayed mostly in bed for 3–4 days per week.[60] Plaintiff also
testified that although he can be sociable in one-on-one settings, he has problems
with crowds, giving a full city bus as an example of a setting with too many
people.[61]

In discounting Plaintiff's mental-health symptom testimony, the ALJ noted
that Plaintiff was not currently undergoing counseling and has not taken mental-
health medications for years.[62] The ALJ also recited a treatment history and cited

---

[58] *See* AR 30; *see also* U.S. Dep't of Labor, *Dictionary of Occupational Titles* at
381.687-018 (Cleaner, Industrial), 1991 WL 673258; *id.* at 323.687-010 (Cleaner,
Hospital) 1991 WL 672782; *id.* at 920.587-018 (Packager, Hand), 1991 WL 687916.

[59] AR 93.

[60] AR 94, 122–23.

[61] AR 93–94, 122.

[62] AR 24–25.

to treatment notes including benign mental-status findings, Plaintiff's self-reported activities, and later reports by Plaintiff that he was doing well.[63]  Thus, fairly read, the ALJ's decision also includes implied findings that Plaintiff's symptom testimony was inconsistent with the cited treatment notes.

a.    *Conservative Treatment of Mental-Health Impairments*

For the same reasons discussed above regarding Plaintiff's physical-impairment symptom testimony, on this record—absent additional explanation and/or evidence—a lack of prescription mental-health medications is not a convincing reason to discount Plaintiff's mental-health symptom testimony.[64]  Additionally, Plaintiff implied that the reason he was no longer receiving counseling was because of "the COVID shutdown."[65]  Finally, "it is a questionable

---

[63] AR 25.

[64] *See Garrison v. Colvin*, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) (holding an ALJ may not reject a claimant's symptom testimony based on a lack of treatment if "the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions").  Psychologists who evaluated Plaintiff indicated Plaintiff may have been self-medicating by drinking excessive amounts of Pepsi. *See* AR 613, 635, 662; *see also* AR 628 (April 2010: "He was noted to have seriously decayed teeth, bad breath.  He had a history of past drug use, none recently, drank a lot of Pepsi.").

[65] AR 119.

practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."[66]  To reject Plaintiff's mental-health testimony based on a conservative level of care, the ALJ was required to provide a more meaningful explanation, supported by substantial evidence, as to why the potential alternative reasons found in the record do not sufficiently explain Plaintiff's type and degree of treatment.

b.    <u>Treatment Notes Containing Self-Reports</u>

Throughout the ALJ's analysis of Plaintiff's mental impairments, the ALJ relied on a certain set of treatment notes.[67]  Describing Plaintiff's mental impairments, the ALJ acknowledged that "the record demonstrates a history of ADHD, depression, anxiety, and learning disorder."[68]  The ALJ then recited Plaintiff's treatment history, starting in April 2019.

***i.    Mental-Status Results from April 2019***

Citing to a single April 23, 2019 treatment note, the ALJ stated that Plaintiff "complained of depressed mood, low energy, anxiety, and irritability," but "[a]n examination demonstrated average eye contact, a cooperative attitude, a

---

[66] *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1209–1300 (9th Cir. 1999).

[67] *See* AR 22–23, 25, 27–28 (repeatedly referring to the same set of treatment notes).

[68] AR 25 (cleaned up).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

euthymic mood with a full affect, logical thought processes, normal thought content, normal cognition, estimated average intelligence, and normal insight and judgment."[69]  The ALJ's repeated reliance on this one examination is problematic for a few reasons.[70]

An ALJ may validly consider discrepancies between a claimant's reported symptoms and the observations of treatment providers.[71]  While one could reasonably infer that someone experiencing severe depression and/or anxiety would be more likely to exhibit an abnormal mood and affect, that is not necessarily true for the other normal findings which the ALJ apparently found important.  As courts have repeatedly noted, "the treatment records must be viewed in light of the

---

[69] AR 25 (citing AR 674–76). *See also* AR 22–23 (citing the same in analyzing the Paragraph B criteria of understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintain pace; and adapting or managing oneself); AR 27–28 (citing the same in assessing the opinions of Dr. Donahue, Dr. Morgan, and Mr. Owens).  Elsewhere, the ALJ also cited to a May 2019 mental-status exam performed by Dr. Morgan, but only once and in the context of assessing Dr. Morgan's medical opinion. *See* AR 27 (citing AR 711).

[70] Notably, the ALJ's recitation is accurate but omits that the treating provider indicated he had not used any "evidence-based screening tool(s)" in assessing Plaintiff's mental health. AR 674.

[71] *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

overall diagnostic record," and a claimant's reports of suffering from severe depression and/or anxiety are not necessarily inconsistent with that claimant also presenting with normal cognitive abilities, such as "good eye contact, organized and logical thought content, and focused attention."[72]  The ALJ gave no explanation for why Plaintiff's claimed mental-health symptoms and limitations are inconsistent with him demonstrating average eye contact, a cooperative attitude, and/or cognitive abilities within normal limits.

Further, though the record reflects Plaintiff frequently presented at other appointments with a normal mood and affect, there are also records of him presenting as depressed, anxious, and/or fatigued.[73]  Because the record contains such mixed evidence, it was improper for the ALJ to rely on a single mental-status

---

[72] *See, e.g., Ghanim*, 763 F.3d at 1164 (finding the ALJ erred by rejecting the claimant's symptoms resulting from anxiety and depressive disorder on the basis that the claimant performed cognitively well during examination and was described as "upbeat," "smiling very brightly," and "more talkative about positive things").

[73] *Compare, e.g.*, AR 646, 675, 682, 711, 723, 738 (each indicating a normal mood and affect) *with, e.g.*, AR 617, 633, 653 (each indicating an irregular mood and/or affect).

exam to imply a broad and consistent pattern.[74]  Moreover, the record contains at least some evidence suggesting that Plaintiff does not always present with a mood and affect consistent with the severity of his symptoms.

In August 2014, Plaintiff attempted suicide by jumping out a car traveling 60–65 mph, and he was brought by ambulance to the emergency department.  Even while treating his injuries and summoning the crisis response unit, the emergency-department personnel noted Plaintiff's presentation as "normal affect, no emotional distress noted."[75]  Then, when the crisis response unit assessed Plaintiff, the examiner noted, "He was pleasant, had good eye contact, and was cooperative."[76]  Such evidence raises the question of whether Plaintiff may present to many as having a normal mood and/or affect even when he is suffering from severe depression or anxiety.

Given the above, additional explanation—and likely additional medical-expert evidence—is needed for the Court to ascertain whether the normal mental-status findings cited by the ALJ provide a reasonable basis for discounting

---

[74] *See Garrison*, 759 F.3d at 1018 ("While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must in fact constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard.").

[75] AR 494.

[76] AR 503.

Plaintiff's mental-health symptom reports.[77]  On this record, the ALJ's proffered

reason is neither clear nor convincing; nor is it supported by substantial evidence.

### ii.    Reported Activities from 2019

The ALJ called attention to Plaintiff's reported activities from May through

December 2019, citing five treatment notes from that period.

> [In early May], the claimant reported that he was excited that he was
> able to get tickets for a wrestling event.  In late May of 2019, the
> claimant reported that he was able to get out four days last week,
> including attending a live wresting event.[78]  A week later, the
> claimant reported that he was so exhausted "from running around"

---

[77] See *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988) (requiring the ALJ to

identify the evidence supporting the found conflict to permit the Court to

meaningfully review the ALJ's finding); *see also Day*, 522 F.2d at 1156 (recognizing

that an ALJ is "not qualified as a medical expert" and should not go outside the

record for purposes of "making his own exploration and assessment as to the

claimant's [mental] condition").

[78] Although the error is likely inconsequential, in the May 2019 treatment note to

which the ALJ cites, it does not appear that Plaintiff reported attending "a live

wresting event."  Rather, Plaintiff reported housesitting briefly for a woman,

saying, "while she went to work . . . I got to watch SmackDown live[,] WWE[,] [and]

History Channel[;] it was fun since I don't have cable." AR 696.  This suggests

Plaintiff was referring to watching the Smackdown event on television. *See*

https://www.fox.com/wwe-friday-night-smackdown/ (listing television airtimes).

1

2          that he decided to stay home over the weekend . . . .[79] In June of 2019,
          he reported that he had been getting out to pay bills.  Therapy records
          from October of 2019 noted that the claimant had recently gone out
3          with his girlfriend and her mother.  In December of 2019, the
          claimant reported that he was mostly staying home and only going out
4          for groceries.[80]

5          It is unclear how any of the activities identified by the ALJ are inconsistent

6   with Plaintiff's testimony that his mental impairments caused him to stay at home,

7   mostly in bed, 1–4 days per week on average.[81]  Rather, the record reflects that—

8   mirroring his testimony—Plaintiff consistently reported getting out of the house

9   only a few times per week.[82]  More, the content and tenor of the treatment notes at

10

11  _____

12  [79] The ALJ did not explain, and it is not clear from the record, what Plaintiff meant

13  by "running around."  Absent more information, this report is too vague to

    reasonably be considered inconsistent with Plaintiff's symptom testimony.

14  [80] AR 25 (cleaned up).

15  [81] *See* AR 93–94, 122–23.

16  [82] *See, e.g.*, AR 701 (May 7, 2019: Plaintiff reporting that he had not "not really"

17  gotten out other than to pick up his tickets, and his therapist inquiring about "how

18  will he manage when he as to go to this wresting event"); AR 696 (May 22, 2019:

19  Plaintiff reporting he "was able to get out four days last week," to which his

20  therapist "praised him and asked how did he feel"); AR 753 (June 10, 2019:

21  Plaintiff reporting getting out but indicating it was limited to paying bills); AR 750

22  (Oct. 2019: Plaintiff reporting going out with his girlfriend and her mother for his

23

that time suggest that each of the identified activities was viewed as an accomplishment—a remarkable event rather than a common occurrence.  Where a claimant's reported activities do not contradict his symptom testimony, the ALJ may reject such symptom testimony only upon making "specific findings relating to the daily activities and their transferability" to a work setting.[83]

The ALJ erred by rejecting Plaintiff's mental-health symptom testimony based on his reported activities without articulating any meaningful inconsistency.  On this record, the ALJ's proffered reason is neither clear nor convincing; nor is it supported by substantial evidence.

### iii.    *Self-Reports of Doing Well from 2020*

Last, the ALJ went on to cite two of the more-recent treatment notes from Plaintiff's therapy sessions indicating he was doing well.  The ALJ wrote,

> Treatment records from early 2020 noted that the claimant reported
> "doing awesome" and that he was staying at home and playing video

---

birthday, indicating he was relieved that "it turned out to be okay"); AR 758 (Dec. 2019: Plaintiff reporting "nothing[']s really changed" and that he leaves only when he needs groceries and then returns back home).

[83] *See Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *See also Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) (The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability.").

games.  Overall, he reported that everything had "been going good." More recently, in late May of 2020, the claimant stated that "other than being bored" he was "doing okay", that he was trying to keep himself busy playing video games, and that he was trying to spend time with his friend.  Additionally, he reported that he was only going out for groceries.[84]

"[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability," and an ALJ may discount a claimant's reported symptoms if they sufficiently improved with treatment.[85]  However, when presented with evidence of mental-health improvement, it can sometimes be difficult to determine whether such improvement is attributable to the treatment being administered or the inherent tendency of mental-health symptoms to wax and wane.[86]  Further, simply because a claimant shows some improvement does not mean that his symptoms have improved to point where they no longer preclude competitive employment.[87]  As such, for evidence of successful treatment to provide

---

[84] AR 25–26 (cleaned up).

[85] *See Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also* 20 C.F.R. §§ 404.1529(c)(3), 416.913(c)(3); *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 599–600 (9th Cir. 1999) (considering evidence of improvement).

[86] *See, e.g.*, *Wellington*, 878 F.3d at 876; *Garrison*, 759 F.3d at 1017 ("Cycles of improvement and debilitating symptoms are a common occurrence. . . .").

[87] *See Garrison*, 759 F.3d at 1017 (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)).

a valid basis for an ALJ to reject the claimant's mental-health symptom reports, the evidence must demonstrate that (1) the relief is lasting, and (2) the type and degree of relief are such that it is truly at odds with the symptom reports being rejected.[88]

Here, the earliest record cited by the ALJ is a treatment note from January 2020,[89] though the record reflects that Plaintiff similarly reported "doing good overall" as early as October 2019.[90]  Given the recency of these treatment notes and the fact that Plaintiff filed his application in August 2017, the ALJ's reasoning does not speak to the entirety of the relevant period.[91]  Even if Plaintiff's self-reports were sufficient to show he was not disabled from late 2019 to early 2020, the

---

[88] *See Garrison*, 759 F.3d at 1017–18; *see also Reddick v. Chater*, 157 F.3d 715, 723 (9th Cir. 1998) (recognizing that an ALJ must account for the context of the claimant's prior report as well as the nature of his impairment and its symptoms).

[89] AR 25 (citing AR 772).

[90] AR 755.

[91] *See Smith v. Kijakazi*, 14 F.4th 1108, 1113 (9th Cir. 2021) (holding that the claimant's testimony "could not be discredited as a whole because of changes over time or inconsistencies relevant only to portions of testimony describing a certain period").

treatment notes relied upon by the ALJ would not foreclose the possibility of Plaintiff nonetheless qualifying for a closed period of disability.[92]

The latest treatment note regarding Plaintiff's self-reports of doing well is from May 2020.[93] But the record lacks any medical opinions or other medical evidence informing the issue of whether—given Plaintiff's specific mental impairments—this is a sufficiently long period to attribute Plaintiff's reported relief to successful treatment rather than a natural, and temporary, waning of his mental-health symptoms. Still, even assuming the duration to be sufficient, the same therapy notes from that period also reflect that Plaintiff continued to report mostly staying within the confines of his house.[94] Moreover, reports of "doing well" in the context of mental-health treatment do not necessarily speak to any objective level of functioning.[95] Accordingly, the treatment notes on which the ALJ relied,

---

[92] *See* 42 U.S.C. § 1382c (providing that claimants may generally receive benefits for any period of disability lasting, or expected to last, at least 12 months).

[93] AR 779–80; *see also* AR 25–26 (citing the same).

[94] *See* AR 758 (Dec. 2019: Plaintiff reporting going out only to buy groceries); AR 772 (Jan. 2020: Plaintiff reporting "doing okay" overall, but in the context of staying at home playing video games); AR 774 (May 2020: Plaintiff reporting "doing okay," but in the context of going out only for groceries).

[95] *See Orn*, 495 F.3d at 634; *see also Garrison*, 759 F.3d at 1017 (quoting with approval *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("We also believe

despite showing improvement/relief, are also nonetheless consistent with Plaintiff's testimony that his mental impairments kept him at home 1–4 days in an average week.[96]

On this record, Plaintiff's relatively recent self-reports of doing well did not serve as a clear or convincing reason for the ALJ to reject Plaintiff's mental-health symptom testimony.

### c.    *Consequential Error*

The ALJ relied upon evidence of normal mental-status results, Plaintiff's limited activities, and Plaintiff's recent self-reports of doing well in a therapy context, yet the ALJ failed to adequately explain how such evidence could undermine any of Plaintiff's symptom testimony.  The ALJ therefore failed to provide any specific, clear, and convincing reason, supported by substantial evidence, for rejecting Plaintiff's symptom testimony.  Vocational-expert testimony establishes that if Plaintiff's testimony had been fully credited—particularly his

_____

that the Commissioner erroneously relied too heavily on indications in the medical record that [the claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to [his] work-related functional capacity.")).

[96] *See* AR 93–94, 122–23.

1
2
testimony regarding his mental impairments being sufficiently severe to keep him

from leaving his house on a weekly basis—he would have been found disabled.[97]

3
**B.    Medical Opinions: Plaintiff shows error.**

4
5
6
7
8
Reversal is already required based on the ALJ's errors in assessing

Plaintiff's symptom reports.  Further, the ALJ's view on Plaintiff's symptom

reports likely impacted the ALJ's analysis throughout his decision, including his

assessment of the medical opinions and other evidence of record.  As such, the

Court need not address Plaintiff's other allegations of error.

9
10
11
12
13
14
15
Even so, the Court notes that throughout the ALJ's mental-impairment

analysis—including his assessment of the medical-opinion evidence and the

Listings' Paragraph B criteria—the ALJ cited to the same treatment notes and

applied the same erroneous reasoning that he used to discount Plaintiff's symptom

reports.[98]  In evaluating the persuasiveness of the medical opinions, the ALJ failed

to adequately articulate how the opinions being rejected were rendered less

persuasive by the evidence being relied upon.[99]

16
17
18
19
[97] *See* AR 136 (opining that employers would generally tolerate no more than one

absence per month on average).

[98] *See* AR 22–23, 25, 27–28.

20
21
22
[99] *See* 20 C.F.R. §§ 404.1520c, 416.920c (setting forth relevant factors and

articulation requirements for the ALJ to follow when analyzing medical opinions);

*Embrey*, 849 F.2d at 421–22 (requiring the ALJ to identify and explain

23

1

**C.    Remand: Further proceedings are required.**

2        Plaintiff seeks a remand for payment of benefits.  However, further

3   proceedings are necessary because significant questions of fact remain, and

4   disability is not clearly established.[100]  On remand, the ALJ shall conduct the

5   disability evaluation anew, beginning at step two, subject to the following

6   instructions.

7        • The ALJ shall expressly address Plaintiff's hernia and what effect, if any,

8          it has on Plaintiff's RFC.

9        • If the ALJ again discounts Plaintiff's symptom reports, the ALJ must

10         articulate specific, clear, and convincing reasons for doing so.[101]  General

11         findings are insufficient because the Court cannot affirm discounting

12         Plaintiff's symptoms for a reason not articulated by the ALJ.[102]  The ALJ

13         must identify what symptoms are being discounted and what evidence

14

15

16

17   _____

18   inconsistencies before discounting a medical opinion based on the consistency

     factor).

19   [100] *See Leon v. Berryhill*, 800 F.3d 1041, 1045 (9th Cir. 2017); *Garrison*, 759 F.3d at

20   1020.

21   [101] *Ghanim*, 763 F.3d at 1163.

22   [102] *See Garrison*, 759 F.3d at 1010.

23

undermines these symptoms.[103]  In doing so, the ALJ should be mindful not to conflate inconsistency with the mere absence of support—a claimant's symptom reports cannot be discounted solely on the grounds that they are not fully corroborated by objective medical evidence.[104]

- Further, if the ALJ again relies upon conservative treatment as a reason to discount Plaintiff's symptom testimony (or any other evidence), the ALJ must expressly consider what treatment options are available and whether the evidence supports any alternative explanations—reasons other than Plaintiff's symptoms being less severe than he claims—for why Plaintiff has not pursued treatment of a different type or degree of available treatment.

- As to the medical-opinion evidence, the ALJ must meaningfully articulate the supportability and consistency of each medical source, specifically including Dr. Marks.

- As to Plaintiff's scoliosis/back pain and hernia—especially if the ALJ again rejects all the current medical opinions regarding Plaintiff's physical impairments and resulting limitations—the ALJ is encouraged to call a medical expert who is qualified to assess the significance of the

---

[103] *Ghanim*, 763 F.3d at 1163 (requiring the ALJ to sufficiently explain why he discounted claimant's symptom claims).

[104] *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

medical evidence, specifically including the physical-exam results and the medical imaging in the record, in the context of scoliosis/back pain and/or a hernia.

- As to Plaintiff's mental impairments, the ALJ is also encouraged to call a mental-health expert qualified to assess the significance of the medical evidence, specifically including the normal mental-status findings, as well as the extent to which Plaintiff's mental-impairment symptoms may reasonably be expected to wax and wane, even with treatment.

- Generally, unless made clear by context, the ALJ should explain whether a finding applies to the entire relevant period or just a portion thereof.[105]

## V.    Conclusion

Plaintiff establishes the ALJ erred.  The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process as set forth above.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment, **ECF No. 11**, is **GRANTED**.

2.    The Commissioner's Motion for Summary Judgment, **ECF No. 12**, is **DENIED**.

3.    The Clerk's Office shall enter **JUDGMENT** in favor of **Plaintiff**.

---

[105] *See Smith*, 14 F.4th at 1113.

4.   The decision of the ALJ is **REVERSED** and this matter is

**REMANDED** to the Commissioner of Social Security for further

proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

5.   The case shall be **CLOSED**.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and

provide copies to all counsel.

DATED this 6th day of March 2023.

_____

EDWARD F. SHEA
Senior United States District Judge